# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00133-CV

---

**Adrienne Marco, Appellant**

**v.**

**Kurt Kirkman, Appellee**

---

### FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY
### NO. C-1-CV-22-003352, THE HONORABLE ERIC SHEPPERD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Adrienne Marco, a landlord, appeals from the trial court's judgment, following a bench trial, finding her liable for bad-faith retention of a security deposit belonging to her former tenant, appellee Kurt Kirkman. In six issues on appeal, Marco asserts that (1) a cause of action for bad-faith retention of a security deposit "cannot prevail" without a statutory presumption of bad faith; (2) the evidence is insufficient to establish the statutory presumption that Marco acted in bad faith; (3) without the statutory presumption, there is insufficient evidence to prove that Marco acted in bad faith; (4) there is insufficient evidence that Marco failed to show that she acted in good faith to rebut the statutory presumption; (5) there is insufficient evidence that Marco failed to prove that her retention of the security deposit was reasonable; and (6) the trial court abused its discretion in its award of attorney's fees. We will modify the trial court's judgment relating to appellate attorney's fees and affirm in part the

judgment as modified.  We reverse in part and remand the trial court's judgment relating to attorney's fees for non-attorney staff.

## BACKGROUND

In 2019, Kirkman leased a house in south Austin from Marco.  The lease agreement required Kirkman to provide Marco with a security deposit of $2,400 and an additional pet security deposit of $350 for his dog, Bubbles.  The agreement made Kirkman "responsible for clogged sinks, toilet, shower tub, and garbage disposal, all kitchen appliances, including [the] refrigerator ice maker"; responsible for changing the AC filters on a monthly basis; responsible for maintaining the yard at his own expense; and required him to repair any damages to the property "beyond normal wear and tear," which the lease defined as "deterioration that occurs without negligence, carelessness, accident, or abuse."

The lease ended in June 2022.  Thirty days after Kirkman surrendered possession, Marco emailed Kirkman the following itemized list of deductions from his security deposit:

| | |
|---|---|
| Replace six window blinds damaged by dog | $425.00 |
| Sheetrock Patches - damaged walls and excessive nail holes | $275.00 |
| Paint patched walls | $1,200.00 |
| Replace and install laundry room door | $250.00 |
| Paint trim on excessive dings on door jams and window sills damaged by dog | $360.00 |
| Paint front door and trim due to scratches and excessive nail holes | $125.00 |
| Replace dead boxwood shrub | $200.00 |
| Removal of tree encroaching on property | $300.00 |
| Tighten loose toilet | $75.00 |
| HVAC repair due to unchanged filter | $255.00 |
| Replace oven and stove lightbulbs | $60.00 |
| Repair discolorations in laminate and wood floors | $500.00 |
| Sand and refinish permanently damaged deep marks and scratches on hardwood floors | $3,900.00 |
| | |
| Total Deductions | $7,925.00 |

The email concluded, "These deductions were made in accordance with your lease agreement and in compliance with [the] Texas Property Code. The original deposit did not cover all costs. The remaining balance owed is $5,175.00."

Shortly thereafter, Kirkman hired counsel and demanded the return of his security deposit. In the demand letter, counsel wrote,

On July 29, 2022, you sent what purports to be an itemization of damages to the property caused by Mr. Kirkman. We contest these amounts. Please provide receipts for the materials and repairs, as well as pictures of the damages. At this time, we have no reason to believe any of the amounts on your list are valid. In fact, you have a reputation for retaining security deposits on questionable grounds.

Accordingly, we hereby demand a full refund of my client's security deposit in the amount of $2,750. We demand an additional amount of $850 for the legal fees my client has incurred in reclaiming the security deposit. Of course, the fees are expected to rise should this matter not be resolved immediately.

. . . .

3

> In the event you choose not to refund the security deposit by 5:00 p.m. on August 16, 2022, then my client instructs me to file a bad faith retention lawsuit pursuant to TEXAS PROPERTY CODE § 92.109. If that is necessary, Mr. Kirkman will be entitled not only to the security deposit and his attorney's fees, but also to $100 and three times the wrongfully withheld portion of the security deposit.

Marco did not respond to the letter by the deadline, and Kirkman filed suit for bad-faith retention of the security deposit. Marco filed a general denial and a counterclaim for breach of contract and later filed a no-evidence and traditional motion for summary judgment, which the trial court denied. The case proceeded to a bench trial.

Marco and Kirkman were the only witnesses to testify at trial. Kirkman testified that the rental property was an "older home," built in 1950 or 1951. He recounted that he had numerous issues with the house when he first moved in, including lights that were not working, "an issue with the water pressure," no hot water, a bathroom door that would not close completely, an ice maker that was not working, grass not growing in the yard, and an oven that would not turn on. Kirkman communicated with Marco about some of these issues. The lack of hot water turned out to be Kirkman's fault—he did not turn on the gas upon moving in, and this was also the reason that the oven was not working. Marco expressed surprise about the absence of grass, believing that seed had been planted before Kirkman moved in. Nothing was done about the ice maker, which was Kirkman's responsibility under the terms of the lease.

Kirkman explained that the heater in the home "was a constant issue" and that he could "only use it two to three times a day for approximately an hour. If you used it longer, it would eventually shoot out cold air, and if you used it too soon between those times, it wouldn't work at all." The heater eventually stopped working during Winter Storm Uri in February 2021. Later, in September 2021, when the temperature outside was "well over 100 degrees," the air

4

conditioner in the house stopped working. Kirkman told Marco about this on a Friday night, but Marco told him on Saturday that her HVAC technician was unavailable to come out to the property until Monday. Kirkman then contacted his own HVAC technician to examine the air conditioner, and this person told Kirkman that he could fix the issue in one to two hours for approximately $200 to $300. However, when Kirkman told Marco about this, she "got very defensive saying that nobody could go into the house . . . to do any sort of work or even diagnose a problem without her consent," and she denied the technician permission to do the work. As a result, Kirkman had to stay in an Airbnb until the air conditioner was fixed.

Kirkman believed that when he moved out of the house, the condition of the property was better than when he had moved into it. He had built a new fence around the yard that he paid for out of his own pocket, and he also paid for the installation of a new toilet because the old toilet was "extremely small," "loose," and had "issues in regards to flushing," with "anything you put into the toilet" having a tendency to clog. Kirkman communicated with and received permission from Marco to install both the new fence and the new toilet.

Kirkman further testified that after he moved out of the property, he paid to have the house cleaned as required by the lease. He believed that he had complied with the requirement that he leave the house in the condition he found it, minus normal wear and tear. Thus, he "almost fainted" when he received the list of itemized deductions from Marco. He was surprised "[b]ecause looking at all of the charges, it was very—it was very clear that these charges were grossly exaggerated or made up entirely." He explained,

> I never had lived in a house where I didn't have some of my security deposit withheld. I expected that, and there was normal wear and tear in the house, no more than just, like, normal living—for example, you know, hanging up pictures,

5

things of that nature. So yeah, I expected to get some of my security deposit withheld, but never in my life did I expect to have the whole thing plus an additional—or roughly $6,000 added to my security deposit in terms of damage, considering that, just generally speaking, my personal habits—I'm a very clean and almost overly kind of clean person. I keep great care of all the houses that I live in. I clean constantly, so this really floored me when I saw it.

Kirkman added that there "were zero documents" that accompanied the deduction list, such as invoices, canceled checks, or receipts. And prior to filing suit, he received no photos, receipts, or supporting documents from Marco relating to the itemized deductions. Kirkman also testified that he had no reason to believe that any of the amounts on the list were valid "because a few months into my lease, her previous tenants visited me and told me that she did the same thing to them."[1]

Kirkman proceeded to explain why he disagreed with each itemized deduction. We summarize this testimony in more detail below. Kirkman acknowledged that there was some damage to the property but in his view, the damage "was all just normal wear and tear." Kirkman took photos of the property prior to moving out, and copies of those photos were admitted into evidence. Kirkman believed he took good care of the property and was a good tenant.

Marco, who testified that she had been a residential landlord since 2006 and that this was her only rental property, disputed Kirkman's account of the property damage. She testified that when she went to the house on the day Kirkman moved out, she saw "scratched floors, broken blinds, kicked-in walls, marks on the walls, marks on all the floors, marks on the outside—the walls on the deck and below the deck, damage everywhere" except for "[t]he tile

---

[1] These previous tenants were not identified during trial. Kirkman asked Marco during discovery to produce their names and contact information, but she did not do so.

floors in the bathroom." Marco also testified that the air conditioner was not working, and the air filter was "very dirty." Marco described the alleged damage to the property in more detail, which we summarize below. Marco admitted into evidence photographs of the property that were professionally taken in 2019 before Kirkman moved into the property and other photographs showing the property after Kirkman moved out. Marco did not believe that the damage caused by Kirkman was from "normal wear and tear" but was instead the result of Kirkman's negligence, carelessness, and abuse of the property.

Marco further testified that she had installed hardwood floors throughout much of the home for approximately $2,400 before Kirkman moved into it. Marco was a healthcare administrator and relied on contractors and subcontractors to do work on the property and provide her with cost estimates of repairs and upgrades. When asked how she determined the amounts to charge Kirkman for the itemized deductions, Marco testified that they were from Cody Hammond, one of her subcontractors, and from other "contractors that came to visit the house and do an assessment of the house." Copies of some of the invoices that Marco received from the contractors were admitted into evidence. These included a $300 invoice from Marco's landscaper to trim the tree that was encroaching onto her roof,[2] a $285 invoice to repair the air conditioner, a $200 invoice to replace a dead boxwood shrub outside the house, and a $541.25 invoice to repair discolorations in laminate and wood floors. There were also invoices from Hammond to perform various handyman services, including tightening the toilet ($75), changing the oven and stove light bulbs ($60), replacing six window blinds ($425), patching two sheetrock holes in the bedroom and repairing "excessive nail holes throughout the house" ($275), painting

---

[2] Marco decided to remove the tree instead of trim it.

all walls throughout the house ($1,200), replacing and installing the laundry room door ($250), painting trim throughout the house from "[e]xcessive dings on jam[b]s and dog damage on window sills" ($360), and painting the front door and trim "due to holes in trim from tenant" ($125).[3]  No invoice related to the largest item on the deduction list, the $3,900 to "sand and refinish permanently damaged deep marks and scratches on hardwood floors," was admitted into evidence.[4]

Marco testified that she did not immediately respond to Kirkman's demand letter because she "didn't see it right away" and "was traveling back and forth" around that time to see a family member who had been seriously injured in a mountain-biking accident in July 2019. Marco also acknowledged that during discovery, she did not provide Kirkman with bank records regarding what she did with his security deposit because "she couldn't find them," nor did she provide him with the names and contact information of her previous tenants.  She also acknowledged that before the lawsuit, she did not provide Kirkman with receipts of paid invoices, canceled checks, or credit-card charges relating to the itemized deductions, although she did provide Kirkman with invoices after the lawsuit was filed.

The following summarizes Kirkman's and Marco's conflicting evidence relating to each item on the deduction list:

---

[3]  The invoices from Hammond also included several items that were not on the list of itemized deductions, including purchasing and installing new smoke detectors ($260), purchasing and installing a new kitchen faucet with new supply lines ($175), repairing the kitchen sink drain ($65), applying caulk to the bathtub ($25), purchasing and installing a new light in the hall ($35), and repairing siding off the back deck ($280).

[4]  Kirkman obtained a running objection to the admissibility of Marco's invoices on the basis that they were hearsay.  The trial court overruled the objection as to invoices that Marco testified that she had already paid but sustained the objection as to the $3,900 invoice because she had not paid it.

**Replace six window blinds damaged by dog ($425)**

Marco testified that there were six sets of blinds that were "broken" and needed to be replaced entirely. Photos of damaged blinds were admitted into evidence.

Kirkman testified that "the blinds were untouched except for two windows [in the bedroom] that my dog would look out of. . . . There was approximately six or seven shingles that were bent because he put his head there." But "[a]s far as the blinds throughout the rest of the house, they were opened and closed, that was the extent of their use." Kirkman acknowledged there was a possibility that one of the shingles on the blinds in the living room may have been bent from his dog poking his head through it, and the tilt wand had fallen off another set of blinds. When shown Marco's photos of the damaged blinds, Kirkman testified that the photos were not accurate: "These are not the blinds the way I left them." The district court admitted into evidence photos taken by Kirkman showing mostly undamaged blinds.

**Sheetrock Patches - damaged walls and excessive nail holes ($275) and paint patched walls ($1,200)**

Marco at first described the walls as "kicked-in," although on cross-examination she acknowledged that the photos showed an "indentation" in the wall. She disagreed with Kirkman's characterization of the damage to the wall as "small," and she described it as a "large hole" later in her testimony, although she acknowledged that "[t]here's only one." Her photos showed what appeared to be more of an indentation than a hole in the wall. The photos also showed nail holes in the walls.

Regarding the nail holes, Kirkman testified, "I hung up pictures that required nailing something in to hold it up, obviously. It wasn't excessive. I had as many pictures up in the house, I guess, as anyone normally would." When he pulled some of the nails off the wall,

9

"there [were] patches of paint that came off with it as well," but "these were areas on the walls that were no larger than 2 inches by an inch." Regarding the damage to the wall, Kirkman testified that when he was putting his bed in, "the corner of either my mattress or my bed frame nicked the wall and a hole was made" in the sheetrock "that was approximately, maybe, 5 to 6 inches by, like, 3." He later added, "It was by no means a big hole."

**Replace and install laundry-room door ($250)**

Marco testified that the door, which was off the hinge, needed to be replaced entirely. On cross-examination, Kirkman asked Marco, "Why not just rehang it?" Marco answered, "Well, because the tenant couldn't replace it back and the handyman couldn't put it back." Kirkman later asked, "So you're saying this door—this perfectly good-looking door had to be replaced, not just rehung, that's your testimony?" Marco testified, "Yeah. That's what I was told."

Kirkman testified, "The door itself was fine. When I lived there, it came off the hinge and it was kind of hard for me to put it back on myself, so I just never put it back on but the door itself was absolutely fine." He added, "Maybe a bracket that—where it came off needed to be replaced, but to say 'replace and install the laundry room door' was a gross exaggeration."

**Paint trim on excessive dings on door jambs and window sills damaged by dog ($360) and paint front door and trim due to scratches and excessive nail holes ($125)**

Marco testified that there were holes on the frame of the front door and that "there's trim that needed to be done" to the door. She added, "The holes needed to be filled and painted and there were various dings throughout the house and the windowsills were—they were damaged so they had to be painted."

10

Kirkman denied that his dog had damaged the windowsills and door jambs in the house. He testified that a door jamb "may have come off." He did not know "if that needed to be replaced or it could just simply be put back on, but there wasn't any sort of damage that required the amount of work that—or the amount of work that costs as much as put there by any means." Kirkman also testified that he did not believe the trim on the front door required repainting. Kirkman acknowledged that he had installed a Ring doorbell and a key lockbox on the front door, but they were "not larger than a couple of inches" and required "four to five [holes] on the lockbox and four, maybe, on the Ring video doorbell, all in close proximity to one another."

**Replace dead boxwood shrub ($200)**

Marco testified that a shrub on the side of the house had died and needed to be replaced. A photo of a dead shrub, next to living shrubs, was admitted into evidence. Marco did not elaborate on why she believed Kirkman was responsible for the shrub dying.

When asked if he believed he "did anything to kill a boxwood bush" while he was living there, Kirkman testified, "I'm going to be honest with you, I'm not quite sure what a 'boxwood shrub' is."

**Removal of tree encroaching on roof ($300)**

Marco testified that the leaves and the branches from a tree "were encroaching on the roof, so it either had to be cut back or cut down and the price was the same to either trim it or cut the tree down so we cut the tree down." Marco believed that this was Kirkman's responsibility under the lease provision requiring him to maintain the yard.

Kirkman testified that he did not believe the tree was his responsibility because he "didn't do anything to make the trees suddenly encroach on the property" and did not "know what I would have to do with trees growing" while he lived there. He did, however, trim the lawn in the yard because his dog "has a habit of eating weeds" that made the dog sick. He also watered the lawn at the beginning of his lease in an attempt to grow grass, but the grass did not grow and Kirkman stopped watering the lawn because "[t]here wasn't anything to water."

**Tighten loose toilet ($75)**

Kirkman acknowledged that the toilet was loose when he moved out, "just like the other one" that Kirkman had paid to replace. The parties disputed whether the loosened toilet amounted to normal wear and tear.

**HVAC repair due to unchanged filter ($255)**

Marco testified that the air filter was "very dirty" after Kirkman moved out, although she did not know when it had last been changed. Marco acknowledged that she had arranged for a contractor to change the filter on a monthly basis, although Kirkman paid for it. She testified that after Kirkman moved out, she "couldn't get the thermostat to work" because the air conditioner had been turned off. However, nothing on the invoice that Marco admitted into evidence indicated that the air conditioner needed to be repaired at that time; the invoice appeared to show routine-maintenance work.

Kirkman testified that he paid to have the filters changed every month using the person who Marco had recommended to him. He added that this happened every single month he lived in the house, with the possible exception of his last month in the house in June 2022.

**Replace oven and stove lightbulbs ($60)**

Marco testified that her handyman replaced the oven and stove lightbulbs after Kirkman moved out. She acknowledged that she did not know whether the bulbs had been replaced before Kirkman moved in.

Kirkman testified that the lightbulbs were not working when he moved in.

**Repair discolorations in laminate and wood floors ($500)**

Marco testified that this charge was to "refinish the floors in the time frame between move out and the new tenant move in." She explained that it was a temporary solution until the floors could be permanently fixed: the contractor would "come[] in and he'll cover up scratches and he'll match paint color so it—so he covered those—all the marks or he tried."

Kirkman testified that if the work was needed, "it was needed on very minimal spaces that I didn't have covered from the day that I moved in." He explained that "there were area rugs and furniture that covered up, roughly, 85 percent of the wood in the house from, like I said, move-in date to move-out date, so to say that all of them needed to be redone, I found to be inaccurate." Photos showing the rugs and furniture covering the floor were admitted into evidence. Kirkman testified that "aside from the areas that were exposed, which were few," he thought the floors "seemed fine. I mean, they seemed in no worse condition than you would expect after somebody living there for three years." He "saw in certain areas" of high foot traffic "that there were some nicks" in the floors but nothing "alarming." He characterized the damage to the floors as "normal wear and tear scratches."

## Sand and refinish permanently damaged deep marks and scratches on hardwood floors ($3,900)

Photos showing some scratches on the hardwood floors were admitted into evidence. No invoice for this work was admitted into evidence. Marco testified that she had Kristynik, a company that finishes hardwood floors, "come in and look at the floors." Marco also contacted the person who had previously installed her flooring for $2,400. This person "verbally told [Marco] what his pricing would be" because "he had done the floors several times before—a couple times, so he told me about the—there were price increases, supply chain; it was, you know, COVID time." When asked if this person gave her an estimate of the cost, Marco testified,

> Well, he said guesstimate, you know, 50 percent increase in supplies, $4.50 a square foot for refinishing the floors because he told me that—because he couldn't—he didn't have time to stop by, so all he had time to do was kind of tell me what the cost would be because he knew the house very well.

In addition to Kirkman's testimony summarized above that he had covered most of the wood flooring with rugs and furniture to prevent damage, Kirkman denied responsibility for any damage to the floors beyond normal wear and tear.

At the conclusion of trial, the trial court took the matter under advisement and later rendered judgment that Marco had retained Kirkman's security deposit in bad faith and that Kirkman was therefore entitled to recover from Marco $100 plus three times the amount of the $2,750 security deposit, for total damages in the amount of $8,350.

The case then proceeded to a hearing on attorney's fees, at which the sole witness was Kirkman's trial attorney, Doran D. Peters. Peters, who has practiced law in Travis County and surrounding counties since 2000, testified that he billed 88.2 hours of work at the rate of

14

$425 per hour, amounting to $37,485; that his partner billed half an hour in the case at the rate of $325 per hour, amounting to $162.50; that one associate billed 1.3 hours of work at the rate of $325 per hour, amounting to $357.50; and that another associate billed 43.7 hours of work at the rate of $275 per hour, amounting to $12,017.50. Peters also testified that "[p]aralegals and legal assistants in my firm billed their time between $160 to $170 an hour. They have billed 21.95 hours in this case for a total of $3,208.50." Peters added that costs in the case amounted to $782.17. Peters testified that the total amount of attorney's fees and costs in the case was $54,010.17.

Peters additionally provided estimates regarding post-judgment attorney's fees at the rate of $525 per hour, including 10 hours to respond to and attend any hearings on any post-judgment motions, 20 hours to prepare findings of fact and conclusions of law, 40 hours to respond to Marco's briefing in this Court, 20 hours to prepare for oral argument before this Court, 15 hours to handle any motion for rehearing, 20 hours responding to any petition to the Texas Supreme Court, and 40 hours if that court ordered full briefing on the merits or oral argument.

Based on the above evidence, the trial court ordered that Kirkman recover from Marco attorney's fees and costs in the amount of $54,010.17. The trial court further ordered that should Marco pursue post-judgment action in this case, then Kirkman was entitled to recover the following reasonable and necessary attorney's fees and expenses for the following post-judgment steps and proceedings as follows: drafting findings of fact and conclusions of law if requested by Kirkman, $10,500; responding to and attending any hearings on any post-judgment motions, $5,000; responding to Marco's brief in the Court of Appeals, $21,000; preparation for oral argument before Court of Appeals and argument, $10,500; responding to motion for rehearing

15

before Court of Appeals, if any, $7,875; responding to any petition to the supreme court, $10,500; preparation for and briefing of argument before the supreme court, if petition is granted, $21,000.

Marco filed a notice of appeal from the trial court's final judgment. The trial court later made findings of fact and conclusions of law, including the following:

## I. FINDINGS OF FACT

1. Defendant Adrienne Marco owns the residential property located at 2802 S. 4th Street, Austin, Travis County, Texas 78704.

2. Plaintiff Kurt Kirkman leased the property from Defendant between July 1, 2019, and June 30, 2022, under a written lease.

3. Provisions of the lease included:

> a. Monthly rental payments of $2,400.00 and a separate security deposit of $2,400.00;

> b. A pet agreement allowing Plaintiff to keep Bubbles, a 5-year-old Stafford Terrier mix weighing 58 pounds, subject to a pet deposit of $350 and a nonrefundable payment of $350. Plaintiff was liable for "any damage" caused by the dog.

. . . .

4. Plaintiff furnished the house and lived there with Bubbles for three years.

5. While occupying the property, Plaintiff took actions including placing rugs and furniture over a large portion of the wood flooring; affixing an electronic doorbell and key lockbox to the front door casing, using screws that were removed at move-out; and with Defendant's permission, paying contractors to upgrade the fence and toilet.

16

6. Plaintiff vacated the property in July 2022, leaving damages that included:

a. Wear, discoloration, and scratches to the wood floor, especially in the uncovered area between the living room rug and the kitchen tile floor;

b. Various holes and surface damage to the sheetrock walls and front door frame;

c. Folding laundry closet doors removed from their tracks due to hardware issues;

d. Bent slats of the mini-blinds on at least one window;

e. Loose bolts at the base of the new toilet; and

f. One dead boxwood bush in the yard.

7. Trial evidence did not establish that any of these damages was specifically caused by the dog or exceeded normal wear and tear.

8. Trial evidence concerning a tree on the property and any need for HVAC service was conflicting and inconclusive.

9. Plaintiff vacated the property approximately one week before the lease termination date of June 30, 2022, and had the house professionally cleaned.

10. On July 29, 2022, Defendant provided a list of deductions from the security deposit totaling $7,925.00.

11. After Plaintiff contested the deductions, Defendant declined to provide additional documentation or to refund the security deposit.

12. Defendant intended to deprive Plaintiff of a lawfully due refund and therefore retained the security deposit in bad faith.

13. Following trial, the Court rendered partial judgment awarding Plaintiff three

times the security deposit of $2,750.00 plus $100.00, for a total of $8,350.00 plus prejudgment interest at the contractual 5% rate.

14. Attorney's fees were presented at a subsequent hearing. Plaintiff's reasonable and necessary attorney's fees included $54,010.17 through trial and contingent fees of:

> a. $10,500 for the preparation of proposed findings of fact and conclusions of law;

> b. $5,000 for post-judgment appearances in the trial court;

> c. $21,000 for briefing, $10,500 for oral argument, and $7,855 for rehearing in an intermediate appellate court; and

> d. $10,500 at the petition stage and $21,000 for the merits stage in the Texas Supreme Court.

## II. CONCLUSIONS OF LAW

1. A valid and enforceable lease existed between Plaintiff and Defendant.

2. Plaintiff's suit under Tex. Prop. Code § 92.109 placed the burden on Defendant to prove that her retention of any portion of the security deposit was reasonable.

3. Defendant did not meet her burden of proving by a preponderance of the evidence that her retention of any portion of the security deposit was reasonable; rather, Plaintiff proved by a preponderance of the evidence that Defendant retained the security deposit in bad faith.

4. Accordingly, Plaintiff is entitled to an award of three times the security deposit plus $100.00 and his reasonable and necessary attorney's fees.

5. Plaintiff is further entitled to a judgment that Defendant take nothing on her

counterclaim for damages in excess of the security deposit.[5]

## STANDARD OF REVIEW

We review the trial court's conclusions of law de novo and its findings of fact for sufficiency of the evidence. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). "A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Texas Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). In a legal-sufficiency review, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). In a factual-sufficiency review, we consider all the record evidence and set aside the trial court's finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We defer to the fact finder's implicit determinations of credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## DISCUSSION

**Governing law**

"A security deposit is any advance of money, other than a rental application deposit or an advance payment of rent, that is intended primarily to secure performance under a lease of a dwelling that has been entered into by a landlord and a tenant." Tex. Prop. Code § 92.102. For residential leases, a landlord is required to refund a security deposit to the tenant on or before the 30th day after the date the tenant surrenders the premises. *Id.* § 92.103(a).

---

[5] Marco does not challenge on appeal the trial court's take-nothing judgment on her counterclaim.

19

"Before returning a security deposit, the landlord may deduct from the deposit damages and charges for which the tenant is legally liable under the lease or as a result of breaching the lease." *Id.* § 92.104(a). However, "[t]he landlord may not retain any portion of a security deposit to cover normal wear and tear."[6] *Id.* § 92.104(b). Moreover, if the landlord retains all or part of a security deposit, "the landlord shall give to the tenant the balance of the security deposit, if any, together with a written description and itemized list of all deductions." *Id.* § 92.104(c). "The landlord shall keep accurate records of all security deposits." *Id.* § 92.106.

Kirkman brought his cause of action under Subsection 92.109(a), which provides that "[a] landlord who in bad faith retains a security deposit under this subchapter is liable for an amount equal to the sum of $100, three times the portion of the deposit wrongfully withheld, and the tenant's reasonable attorney's fees in a suit to recover the deposit." *Id.* § 92.109(a). "In an action brought by a tenant under this subchapter, the landlord has the burden of proving that the retention of any portion of the security deposit was reasonable." *Id.* § 92.109(c).

> A landlord's retention of the security deposit may be reasonable if: (1) the tenant is legally liable under the lease or as a result of breaching the lease; (2) the damages did not exist before the tenant leased the premises; or (3) the damages or charges are equal to or in excess of the security deposit or the amount deducted from the security deposit.

*Pulley v. Milberger*, 198 S.W.3d 418, 429 (Tex. App.—Dallas 2006, pet. denied).

---

[6] The Property Code defines "normal wear and tear" as deterioration that results from the intended use of a dwelling, including breakage or malfunction due to age or deteriorated condition, but the term does not include deterioration that results from negligence, carelessness, accident, or abuse of the premises, equipment, or chattels by the tenant, by a member of the tenant's household, or by a guest or invitee of the tenant. Tex. Prop. Code § 92.001(4).

**Statutory presumption of bad faith**

In her first issue, Marco asserts that a cause of action for bad-faith retention of a security deposit "cannot prevail" without the tenant establishing the statutory presumption of bad faith. According to Marco, "A plain reading of the statute requires a § 92.109(a) action to operate strictly in the context of a landlord's bad faith under § 92.109(d)." In her second issue, Marco argues that the evidence is legally and factually insufficient to establish a presumption that Marco acted in bad faith.

The statutory presumption of bad faith is found in Subsection 92.109(d), which provides that "[a] landlord who fails either to return a security deposit or to provide a written description and itemization of deductions on or before the 30th day after the date the tenant surrenders possession is presumed to have acted in bad faith." Tex. Prop. Code § 92.109(d). Here, the evidence is undisputed that Marco provided Kirkman with a written description and itemization of deductions from the security deposit on the 30th day after Kirkman surrendered possession, and Kirkman concedes on appeal that the statutory presumption of bad faith does not apply here. Accordingly, we sustain Marco's second issue.

However, we disagree with Marco that establishing the statutory presumption is a prerequisite to prevailing under a cause of action for bad-faith retention of a security deposit. To prevail under Subsection 92.109(a), the tenant must prove that the landlord retained the security deposit in "bad faith." *See id.* § 92.109(a). Contrary to Marco's contention, the plain language of the statute does not limit bad faith to the circumstances that give rise to the presumption of bad faith, i.e., failing either to return a security deposit or to provide a written description and itemization of deductions on or before the 30th day after the date the tenant surrenders possession. "Bad faith" is not defined in the statute, but Texas courts have defined it as follows:

"A residential landlord acts in bad faith if she either 'acts in dishonest disregard of the tenant's rights or intends to deprive the tenant of a lawfully due refund.'" *Schneider v. Whatley*, 535 S.W.3d 236, 241 (Tex. App.—El Paso 2017, no pet.) (quoting *Johnson v. Waters at Elm Creek, L.L.C.*, 416 S.W.3d 42, 47 (Tex. App.—San Antonio 2013, pet. denied)); *see Pulley*, 198 S.W.3d at 428; *Southmark Mgmt. Corp. v. Vick*, 692 S.W.2d 157, 160 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Courts have held that bad faith can be shown in multiple ways, including with evidence that the landlord retained the deposit to induce or coerce the tenant to take certain actions that the tenant was not legally obligated to perform, *see Southmark Mgmt.*, 692 S.W.2d at 160, that the alleged damage to the property was not shown to be the fault of the tenant, *see Miro v. Garner*, 52 S.W.3d 407, 411 (Tex. App.—Corpus Christi-Edinburg 2001, pet. denied), and that the landlord retained the deposit even though the tenant satisfied all the requirements of the lease to obtain a refund, *see Schneider*, 535 S.W.3d at 241-42. Thus, although evidence giving rise to the statutory presumption is one way that bad faith may be established, it is not the only way. *See id.* at 241.

We overrule Marco's first issue.

**Evidentiary sufficiency**

In her third, fourth, and fifth issues, Marco challenges the sufficiency of the evidence supporting the trial court's judgment. In her third issue, Marco asserts that the evidence is legally insufficient because the trial court "deliberately omitted" a finding as to Marco's dishonest disregard of Kirkman's rights, which Marco contends is "an essential element of bad faith." In her fourth issue, Marco asserts that "[i]f Kirkman impliedly shifted a burden [to Marco] to show good faith, there is factually insufficient evidence that Marco failed to meet her

burden." In her fifth issue, Marco asserts that there is legally and factually insufficient evidence that Marco failed to prove her retention of the deposit was reasonable.

We begin with Marco's contention that the trial court "deliberately omitted" an "essential element" of bad faith. The trial court found that Marco "intended to deprive Plaintiff of a lawfully due refund and therefore retained the security deposit in bad faith." Marco asserts that an intent to deprive Kirkman of a lawfully due refund is not sufficient to support a finding of bad faith. In Marco's view, the trial court must additionally find that Marco acted in "dishonest disregard" of Kirkman's rights. As support for this contention, Marco relies on an unpublished opinion from this Court in which the Court wrote that "[a] landlord acts in bad faith when she acts in disregard of the tenant's rights and with the intention of depriving the tenant of a refund lawfully due." *Grace v. Thompson*, No. 03–12–00729–CV, 2014 WL 3055958, at *3 (Tex. App.—Austin July 3, 2014, pet. denied) (mem. op.). Seizing on this Court's use of the word "and," Marco argues that "[a] landlord's dishonest disregard and an intent to deprive are thus essential elements of bad faith when a tenant does not rely on the statutory presumption."

Marco misconstrues *Grace*. This Court did not in that opinion (or in any other opinion of which we are aware) characterize a landlord's "dishonest disregard" and "intent to deprive" as "essential elements" of bad faith. Rather, this Court merely recited the definition of bad faith above, concluded that the statutory presumption applied in that case, and then considered whether the landlord had sufficiently rebutted the presumption so as to defeat the tenants' motion for summary judgment. *Id.* at *3-5. The case included no discussion of the "essential elements" of bad faith or what a tenant must prove to establish bad faith in the absence of the statutory presumption.

23

However, Texas courts have held that bad faith means acting either in dishonest disregard of a tenant's rights or with intent to deprive the tenant of a refund that is lawfully due. *See, e.g.*, *Hamaker v. Newman*, No. 02-19-00405-CV, 2022 WL 714554, at \*15 (Tex. App.—Fort Worth Mar. 10, 2022, no pet.) (mem. op.); *Schneider*, 535 S.W.3d at 241; *Johnson*, 416 S.W.3d at 47. Thus, when a trial court finds that a landlord acted with intent to deprive the tenant of a refund that is lawfully due, as the trial court did here, that finding is sufficient to support its determination that the landlord acted in bad faith under Subsection 92.109(a). *See A-TX Prop. Mgmt. v. Rodriguez*, No. 03-11-00655-CV, 2013 WL 5853670, at \*3 (Tex. App.—Austin Oct. 17, 2013, no pet.) (mem. op.) ("Bad faith implies an intent to deprive the tenant of a refund that is lawfully due."); *see also Wilson v. O'Connor*, 555 S.W.2d 776, 780 (Tex. App.—Dallas 1977, writ dism'd) (explaining that acting in bad faith under statute means that landlord "intended to deprive the tenant of the refund to which the tenant was entitled," i.e., "an intention to deprive the tenant of the refund lawfully due"). We conclude that the trial court's findings did not omit an "essential element" of bad faith.

We overrule Marco's third issue.

In her fourth issue, Marco argues that "[i]f this Court finds that Kirkman established a presumption of bad faith so as to trigger Marco's burden to prove good faith, it should still hold that she sufficiently carried her burden." *See Pulley*, 198 S.W.3d at 428 ("To defeat the presumption of bad faith, the landlord must prove his good faith, i.e., honesty in fact in the conduct or transaction concerned."). However, as we have already explained, no presumption of bad faith arose in this case, and Kirkman does not contend otherwise. Therefore, Marco did not have a burden to prove that she acted in good faith. Instead, the burden remained

on Kirkman throughout trial to establish that Marco acted in bad faith. *See Schneider*, 535 S.W.3d at 241.

We conclude that the evidence is legally and factually sufficient to support the trial court's finding that Marco acted in bad faith, i.e., that she intended to deprive Kirkman of a refund of his security deposit that was lawfully due. First, although Marco provided Kirkman with an itemized list of deductions, Kirkman testified that no photos, receipts, or supporting documents accompanied the list. Marco acknowledged that before the lawsuit was filed, she did not provide Kirkman with receipts of paid invoices, canceled checks, or credit-card charges relating to the itemized deductions. Instead, she told him that "[t]he original deposit did not cover all costs" and that "[t]he remaining balance owed is $5,175.00." Thus, Marco told Kirkman that he owed her thousands of dollars and provided him with no way to verify whether the deductions from his deposit that had resulted in that balance were legitimate, exaggerated, or entirely fabricated. The trial court could have reasonably inferred that by failing to provide Kirkman with documentation of the alleged damages, Marco was intentionally making it more difficult for Kirkman to challenge the amount of each deduction she was claiming. Additionally, there was no invoice admitted into evidence for the largest item on the deduction list, the $3,900 for sanding and refinishing of the hardwood floors. This one item alone exceeded the entire amount of Kirkman's security deposit, and the amount was based entirely on a "guesstimate" that Marco had received over the phone from the person who had previously installed her hardwood floors in 2019. This amount was in addition to the $500 deduction that Marco had spent to "refinish the floors in the time frame between move out and the new tenant move in," which she testified was a temporary fix. The trial court could have reasonably inferred from this evidence that Marco was charging Kirkman $3,900 not to repair any damage that Kirkman had

25

caused to certain areas of the floors but to obtain new flooring for the entire house. Similarly, the trial court could have found that the $1,200 Marco deducted to "paint all walls through the house" was excessive and in bad faith, when the photographic evidence did not show that all walls needed to be repainted. The trial court could have also found that Marco intended to deprive Kirkman of a lawfully due refund based on other deductions that the trial court could have found to be excessive and unnecessary, including the replacement of the laundry-room door, the replacement of a box shrub without an explanation for how Kirkman was responsible for its death, the removal of an entire tree rather than a trimming of its branches, and the replacement of some blinds that, according to Kirkman, he did not damage. Marco and Kirkman provided conflicting evidence on the severity of the damages to the property and the necessity for repairs, and the trial court resolved those conflicts in Kirkman's favor. Viewing the evidence in the light most favorable to the challenged finding and indulging every reasonable inference that would support it, we conclude that it is legally sufficient to support the trial court's finding that Marco intentionally deprived Kirkman of a refund of his security deposit that was lawfully due.

When considering all of the evidence in the record, we reach the same conclusion regarding factual sufficiency. Marco presented some evidence that she did not act in bad faith, including photographic evidence that showed some damage to the property, invoices showing the costs for most of the items that were deducted from the security deposit, and evidence that Marco was not a professional lessor and thus relied on her contractors to provide her with cost estimates. However, the photographic evidence was inconsistent with Marco's trial testimony concerning the severity of the damage, the invoices did not demonstrate whether the work was necessary to repair damages beyond normal wear and tear, and Marco had been leasing this

26

property since 2006, which militated against a finding that she was an "amateur lessor" who was unaware of the statutory provisions regarding security deposits. In sum, on this record, we cannot conclude that the trial court's finding that Marco acted in bad faith in retaining Kirkman's security deposit is so weak as to make the finding clearly wrong and manifestly unjust.

We overrule Marco's fourth issue.

In her fifth issue, Marco asserts that the evidence is legally and factually insufficient to support the trial court's finding that she did not meet her burden of proving by a preponderance of the evidence that her retention of any portion of the security deposit was reasonable. On this element, Marco bore the burden of proof. *See* Tex. Prop. Code § 92.109(c). ("In an action brought by a tenant under this subchapter, the landlord has the burden of proving that the retention of any portion of the security deposit was reasonable."); *Pulley*, 198 S.W.3d at 432 ("When a landlord is sued under section 92.109(a), the landlord has the burden to prove that the retention of the security deposit was reasonable."). Under the terms of the lease in this case, the "landlord may deduct *reasonable* charges from the security deposit for," among other things, "damages to the Property, *excluding normal wear and tear*, and all *reasonable* costs associated to repair the Property" and "costs for which Tenant is responsible to . . . maintain the Property." (Emphases added.) The lease defined "normal wear and tear" as "deterioration that occurs without negligence, carelessness, accident, or abuse."

"When a party attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). A party attacking the factual sufficiency of a finding on appeal must "demonstrate on appeal that the adverse finding is against the great weight and

preponderance of the evidence." *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 733 (Tex. 2020) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam)).

In this case, the trial court found that Kirkman had caused some damage to the property, specifically "[w]ear, discoloration, and scratches to the wood floor, especially in the uncovered area between the living room rug and the kitchen tile floor"; "[v]arious holes and surface damage to the sheetrock walls and front door frame"; "[f]olding laundry closet doors removed from their tracks due to hardware issues"; "[b]ent slats of the mini-blinds on at least one window"; "[l]oose bolts at the base of the new toilet"; and "[o]ne dead boxwood bush in the yard." However, the trial court also found that the "evidence did not establish that any of these damages was specifically caused by the dog or exceeded normal wear and tear" and that the "evidence concerning a tree on the property and any need for HVAC service was conflicting and inconclusive."

These findings are supported by the record evidence summarized above. On just about every itemized deduction, Marco and Kirkman disputed the extent of the damage, the extent of Kirkman's responsibility for the damage, and/or the reasonableness of the charges to repair the damage:

- On the blinds, the parties disputed the number of blinds damaged and the severity of the damage.

- On the sheetrock, the parties disputed the severity of the damage and whether there was a "large hole" or merely an "indentation" in the wall. Photographic evidence showed more of an indentation.

- On painting the patched walls, the parties disputed whether charging $1,200 to paint the walls was reasonable considering the limited damage shown in the photographs.

28

- On the laundry-room door, the parties disputed whether it was reasonable to replace the door when the door itself did not appear to be damaged but had merely become detached from the hinge.

- On "paint[ing] the trim on excessive dings on door jam[b]s and window sills damaged by dog" and "paint[ing] front door and trim due to scratches and excessive nail holes," the parties disputed the severity of the damage and the amount of work that needed to be done.

- On the boxwood shrub, Marco failed to provide any explanation for how Kirkman had been responsible for the death of the shrub. Photos showed living shrubs next to it.

- On removing the tree, Marco did not explain why it was necessary to remove the entire tree when only the branches were encroaching on her roof, and the trial court was entitled to disbelieve Marco's claim that the cost for tree removal was the same as the cost of branch removal.

- On tightening the loose toilet, although the parties agreed that the toilet was loose when Kirkman moved out, there was no evidence presented that this was the result of anything other than normal wear and tear, as the trial court found.

- On the oven and stove lightbulbs, Kirkman testified that they were not working when he moved in, and Marco acknowledged that she did not know whether the bulbs had been replaced before Kirkman moved in.

- On the HVAC repair, Kirkman testified that he changed the filters every month as required by the lease, with the possible exception of the month he moved out, and Marco did not present any evidence that Kirkman was responsible for any damage to the system.

- On repairing discolorations in laminate and wood floors, the parties disputed the severity of the damage to the flooring, and the photographic evidence was inconclusive.

- On sanding and refinishing the wood floors, the parties disputed whether the damage to the floor was severe enough to warrant the $3,900 "guesstimate" of the repair cost, and Kirkman testified and provided photographic evidence that he covered up most of the flooring with rugs and furniture throughout his lease term, which he testified prevented damage to most of the flooring in the house.

Based on the above evidence, we cannot conclude that Marco conclusively established that her retention of any portion of the security deposit was reasonable. Thus, the evidence was legally sufficient to support the trial court's finding to the contrary. Similarly, we cannot conclude that

the trial court's adverse finding is against the great weight and preponderance of the evidence. Thus, the evidence was factually sufficient to support the finding.

We overrule Marco's fifth issue.

**Attorney's fees**

In her sixth issue, Marco challenges the trial court's award of attorney's fees. Specifically, she argues that Kirkman provided legally insufficient evidence for the amounts charged for non-attorney staff, that Kirkman did not put forth sufficient evidence regarding the reasonableness of appellate attorney's fees, and that the trial court erred by failing to make the award of appellate attorney's fees conditional.

"In Texas, attorney's fees may not be recovered from an opposing party unless such recovery is provided for by statute or by contract between the parties." *Travelers Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996) (orig. proceeding). When a landlord is found liable under Subsection 92.109(a), the tenant may recover from the landlord the tenant's reasonable attorney's fees in a suit to recover the security deposit. Tex. Prop. Code § 92.109(a). Additionally, the lease agreement provided that the prevailing party in any legal proceeding brought under or related to the agreement would be entitled to recover attorney's fees from the non-prevailing party.

"We review a trial court's award of attorney's fees for abuse of discretion." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018). "A trial court abuses its discretion when its 'ruling is arbitrary and unreasonable, made without regard for guiding legal principles or supporting evidence.'" *In re State Farm Mut. Auto. Ins.*, 629 S.W.3d 866, 872 (Tex. 2021) (orig. proceeding) (quoting *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding)). When reviewing a trial court's award of attorney's fees,

30

appellate courts "must ensure the record contains sufficient evidence to support such an award." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020) (citing *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 505 (Tex. 2019)). "The party seeking attorney's fees bears the burden of proof and must supply enough facts to support the reasonableness of the amount awarded." *Id.*

We first address the fees of non-attorney staff. To recover fees for non-attorney staff work, a party must provide evidence of: (1) the non-attorney's qualifications through education, training, or work experience to perform substantive legal work; (2) substantive legal work that was performed under the direction and supervision of an attorney; (3) the nature of the legal work that was performed; (4) the hourly rate charged for the non-attorney staff; and (5) the number of hours expended by the non-attorney staff. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012); *All Seasons Window & Door Mfg., Inc. v. Red Dot Corp.*, 181 S.W.3d 490, 504 (Tex. App.—Texarkana 2005, no pet.).

Here, Peters testified to the hourly rate and the number of hours expended by non-attorney staff, and billing records were admitted into evidence showing at least some substantive legal work performed by staff.[7] However, no evidence was admitted regarding the qualifications of the non-attorney staff or whether they performed the work under the direction or supervision of an attorney. Consequently, we must conclude that the evidence is legally insufficient to support that portion of the attorney's fees award and that the trial court abused its discretion by awarding it. The appropriate remedy is to reverse the part of the judgment that

---

[7] In his appellee's brief, Kirkman has identified $362.50 of substantive legal work out of a total of $3,208.50 billed.

awards Kirkman attorney's fees for non-attorney staff and remand to the trial court for a new hearing on that issue. *See El Apple I, Ltd.*, 370 S.W.3d at 764.

Finally, we turn to the appellate attorney's fees. "An award of conditional appellate attorney's fees to a party is essentially an award of fees that have not yet been incurred and that the party is not entitled to recover unless and until the appeal is resolved in that party's favor." *Ventling v. Johnson*, 466 S.W.3d 143, 156 (Tex. 2015). "At the point when fees are awarded by the trial court, any appeal is still hypothetical." *Yowell*, 620 S.W.3d at 355. "There is no certainty regarding who will represent the appellee in the appellate courts, what counsel's hourly rate(s) will be, or what services will be necessary to ensure appropriate representation in light of the issues the appellant chooses to raise." *Id.* "Of course, this uncertainty does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Id.*

As summarized above, Peters testified to his rate of $525 per hour on post-judgment work, explained why that rate was reasonable in light of his over twenty years' experience practicing law, and listed the specific services that he believed would be necessary on appeal and the hours that would be needed to provide those services. This testimony was uncontroverted by Marco. We conclude that this evidence is sufficient to support the award of appellate attorney's fees and that the trial court did not abuse its discretion by awarding it.

However, we agree with Marco that the trial court's award of appellate attorney's fees should be expressly conditioned on Kirkman's success on appeal. "A trial court may award appellate attorney's fees, but it may not penalize a party for taking a successful appeal by taxing that party with attorney's fees." *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d

32

555, 586 (Tex. App.—Austin 2003, no pet.). "Because an unconditional award of appellate attorney's fees is improper, the trial court must make the award of attorney's fees to an appellee contingent upon the appellant's unsuccessful appeal." *Id*. The appropriate remedy is to modify the judgment "so that the award is expressly contingent upon the ultimate success of appellee." *Id.*

We sustain in part and overrule in part Marco's sixth issue.

## CONCLUSION

We modify the trial court's judgment relating to appellate attorney's fees and affirm in part the judgment as modified. We reverse in part and remand the trial court's judgment relating to attorney's fees for non-attorney staff.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Modified, and as Modified, Affirmed in Part; Reversed in Part and Remanded

Filed:   June 26, 2026